IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 1, 2025

**IN RE AYZELEE G.**

**Appeal from the Juvenile Court for Hamilton County**
**No. 311887   Robert D. Philyaw, Judge**

_____

**No. E2025-00132-COA-R3-PT**

_____

Appellant/Father appeals the trial court's termination of his parental rights to the minor child on the grounds of mental incompetence and failure to manifest an ability and willingness to assume custody. Father also appeals the trial court's determination that termination of his parental rights is in the child's best interest. Father raises additional issues regarding the appointment of counsel and the trial court's denial of his request for continuance. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which ANDY D. BENNETT and KRISTI M. DAVIS, JJ., joined.

Charlotte Mattingly, Chattanooga, Tennessee, for the appellant, Johnnie C.[1]

Jonathan Skrmetti, Attorney General and Reporter, and Mara L. Cunningham, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I. Background**

On May 8, 2022, Appellee Tennessee Department of Children's Services ("DCS") received a referral after police responded to Crystal G.'s ("Mother") home. Mother's neighbor called police after seeing Mother dragging one of her four children around the

_____

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names to protect their identities

yard and beating her with a tree branch. Mother, who was intoxicated, attacked responding officers and had to be sedated. She was arrested for aggravated child abuse, and the four children were taken into DCS custody. By order of December 7, 2022, the Juvenile Court for Hamilton County ("trial court") adjudicated the children to be dependent and neglected. The trial court ultimately terminated Mother's parental rights to all four children, and she did not appeal that decision. By the same order, the trial court terminated Appellant Johnnie C.'s ("Father") parental rights to one of these children, Ayzelee G. (the "Child"). The instant appeal involves only that decision.

In November 2022, Father, who lives in Iowa, contacted DCS claiming to be the Child's father. Although he was not listed on Ayzelee's birth certificate and had not submitted to DNA testing, in January 2020, an Iowa circuit court entered a default judgment naming Father the Child's legal parent. Father informed DCS that, although he had never seen the Child in person, he had made video calls to the Child and Mother until "a few years prior," when he lost contact and did not know their whereabouts. The trial court ordered Father to complete DNA testing before having any contact with the Child. In January 2023, Father completed DNA testing, and the trial court declared him to be the Child's legal and biological father.

On January 12, 2023, DCS sent an Interstate Compact on the Placement of Children (ICPC) request to Iowa to determine whether Father could be a placement option for the Child. On March 21, 2023, Iowa denied approval of the Child's placement with Father because Father lacked a support system, was untruthful about his mental health and medication, and could not financially support the Child. Based on concerns regarding Father's mental health, DCS ordered a mental health assessment, which was conducted by Benjamin James Biller, a Senior Psychological Examiner with Health Management Services. Mr. Biller's findings are discussed below.

After paternity was established, Father was allowed one hour per week of supervised, virtual visitation. As discussed in detail below, Father behavior during these visits was troubling; nonetheless, after a review hearing, Father was allowed in-person, supervised visits. His behavior did not improve, and the trial court suspended visitation.

On April 2, 2024, DCS filed its petition to terminate Father's parental rights to the Child. As discussed below, during the proceedings, six attorneys have been assigned to represent Father. Furthermore, the trial court has granted several continuances. DCS's petition was heard by the trial court on November 12 and 13, 2024. On November 27, 2024, the trial court entered its written order terminating Father's parental rights on the grounds of mental incompetence and failure to manifest an ability and willingness to assume care of the Child. The trial court also determined that termination of Father's rights was in the Child's best interest. On December 2, 2024, Father moved for a new trial under Tennessee Rule of Civil Procedure 59. The trial court denied the motion on January 16, 2025. Father filed a timely notice of appeal on January 30, 2025.

## II. Issues

Father raises the following issues for review as stated in his brief:

I. Whether the trial court erred in denying Appellant counsel or by finding that Appellant had effectively waived counsel.

II. Whether the trial court erred in denying Appellant's motions of November 6th, 2024, and November 12th, 2024, requesting continuance.

III. Whether the trial court erred in finding clear and convincing evidence that grounds for termination of parental rights existed.

IV. Whether the trial court erred in finding clear and convincing evidence that termination was in the best interest of the minor child.

## III. Standard of Review

It is well-settled that:

A parent's right to the care and custody of [his or] her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clause of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors. . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522-23 (Tenn. 2016) (footnote omitted).

Termination of parental rights proceedings are governed by statute in Tennessee, *In re Kaliyah S.*, 455 S.W.3d 533, 541 (Tenn. 2015), and the statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))) (internal

quotation marks omitted).

Tennessee Code Annotated section 36-1-113 governs the termination of parental rights. It provides, in pertinent part:

(c) Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36-1-113(c). Therefore, every termination of parental rights case requires the trial court "to determine whether the parent has engaged in a course of action or inaction that constitutes one of the statutory grounds for termination[,]" and whether termination of the parent's rights is in the child's best interest. *In re Donna E.W.*, No. M2013-02856-COA-R3-PT, 2014 WL 2918107, at *2 (Tenn. Ct. App. June 24, 2014). "Because the stakes are so profoundly high[ ]" in a termination of parental rights case, the statute "requires persons seeking to terminate a . . . parent's parental rights to prove the statutory grounds for termination by clear and convincing evidence." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). This Court has observed that "[t]his heightened burden of proof minimizes the risk of erroneous decisions." *Id.* (citations omitted).

If the trial court determines that clear and convincing evidence supports grounds for termination in light of its factual findings, the court "should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d at 555. The party petitioning for the termination of parental rights bears the burden of demonstrating that termination is in the best interest of the child by clear and convincing evidence. *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010).

We review the trial court's findings of fact *de novo* on the record with a presumption of correctness. Tenn. R. App. P. 3; *In re Carrington H.*, 483 S.W.3d at 524 (citations omitted). However, "[i]n light of the heightened burden of proof in termination proceedings . . . [we] must make [our] own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citation omitted). A trial court's conclusion that clear and convincing evidence supports termination of parental rights is a conclusion of law that we review *de novo* with no presumption of correctness. *In re Carrington H.*, 483 S.W.3d at 524 (citation omitted). "This standard of review is consistent with the standard of review for mixed questions of law and fact." *In re Taylor B.W.*, 397 S.W.3d at 112-113 (citing *Starr v. Hill,* 353 S.W.3d 478, 481-82 (Tenn. 2011) ("Although a presumption of

correctness attaches to the trial court's findings of fact, we are not bound by the trial court's determination of the legal effect of its factual findings[.]").

## IV. Appointment of Counsel

Before addressing the trial court's termination of Father's parental rights, we first address his issue concerning appointed counsel. Although the United States Supreme Court has declined to hold that due process requires the appointment of counsel in each and every parental termination case, ***Lassiter v. Dep't of Social Servs.***, 452 U.S. 18, 31 (1981), "Tennessee statutorily provides the right to appointed counsel for indigent parents in every parental termination proceeding." ***In re Carrington H.***, 483 S.W.3d at 527; *see also* Tennessee Code Annotated section 37-1-126(a)(2)(B)(ii) ("A parent is entitled to representation by legal counsel at all stages of any proceeding under this part in proceedings involving ... [t]ermination of parental rights pursuant to § 36-1-113."). Consequently, there is no dispute that Father initially had a statutory right to counsel. However, while a parent's right to appointed counsel in a termination of parental rights proceeding is well-established in Tennessee, this Court has acknowledged that where a parent fails to adequately cooperate or communicate with their counsel before trial, the client may have impliedly waived the "right to appointed counsel by his or her conduct." ***In re Jamie B.***, No. M2016-01589-COA-R3-PT, 2017 WL 2829855, at *4 (Tenn. Ct. App. June 30, 2017); *see also* ***State Dep't of Children's Servs. v. Agbigor***, No. M2000-03214-COA-R3-JV, 2002 WL 31528509, at *5-6 (Tenn. Ct. App. Nov. 15, 2002) (holding that the right to counsel was waived where father left the country before trial, failed to contact and otherwise cooperate with his attorney, and returned only shortly before the termination hearing); ***In re M.E.***, No. M2003-00859-COA-R3-PT, 2004 WL 1838179, at *12 (Tenn. Ct. App. Aug. 16, 2004) ("Failure to cooperate with appointed counsel can constitute a waiver of the right to appointed counsel."). As set out in its order terminating his parental rights, the trial court found that Father waived his right to appointed counsel:

> The court recognizes that Tennessee law necessitates appointment of counsel in termination of parental rights cases when a parent qualifies. During this custodial episode, the court has appointed multiple attorneys to represent [Father]. Each of those relationships failed and [Father] either asked them to withdraw or the attorney asked to be relieved citing the Rules of Professional Conduct requiring their withdrawal. At times, [Father] has chosen to represent himself. On at least the last two occasions the court has taken up motions regarding relieving [Father's] attorneys, the court has cautioned [Father] and encouraged him to work with the appointed attorney to prepare his defense, even warning him that the right to counsel can be waived by certain acts or obvious noncooperation and that the court will likely not continue to appoint attorneys to represent him. Despite his current request for another attorney to be appointed, the court finds that [Father] has consistently shown an unwillingness to be represented and therefore has

- 5 -

effectively waived his right to counsel.

> The court ultimately appointed an experienced attorney, not to represent [Father], but to serve as "elbow counsel" to advise, assist, and answer questions for him. [Father] rejected that assistance.

Indeed, during the course of these proceedings, the trial court appointed six attorneys to represent Father. All filed motions to withdraw based on Father's failure to cooperate in his representation. At the September 11, 2024 hearing, Father asked for a continuance based, *inter alia*, on the fact that he did not have representation, and the following dialogue ensued:

> [FATHER]: . . . Yes, I would like an attorney to represent me. I'm not understanding.
>
> THE COURT: . . .The problem with that is, and we've discussed this, you had attorney Chase Walker, Attorney Sam Quattrochi, Attorney Dorothy Maynard, Attorney Greta Locklear and Attorney Jeff Kelle represent you in these matters in the underlying D&N
> and the TPR matter.
>
> [Father]: That is correct. . . . They represented me incorrectly.
>
> THE COURT: Which indicates to me that you're not going to accept any attorney's representation.
>
> ***
>
> The Court feels compelled to grant a short continuance and to appoint a final attorney to represent [Father].
>
> [Father]: Judge, make sure he can do his job.
>
> THE COURT: [Father], the Court has in somewhat anticipation of this potential, the last time we were here talking to [Father] about attorney representation, I have identified an attorney and spoken to him and he has agreed to accept this appointment. He's a very experienced attorney, very capable attorney, very knowledgeable attorney who may or may not do what [Father] desires him to do, but he will do what is under the law and under his professional obligations. And [Father], I cannot stress to you enough that this is the final—the last attorney that I'm going to appoint for you. . . . The law is fairly clear that I don't have to continue appointing attorneys just for you to break up the relationship with them arguably . . . in an effort to prolong and continue this matter. So the Court is going to appoint Chris Stiles to represent you.

Mr. Stiles agreed to take the case, but by October 2024, he had filed a motion to withdraw. At the October 9, 2024 hearing on that motion, Mr. Stiles explained that Father was uncooperative. Father disputed Mr. Stiles' allegations and asked for a continuance.

The trial court granted Mr. Stiles' motion, explaining:

> [S]o trial courts are under a mandatory duty to appoint counsel for indigent parents. However, a parent may implicitly waive this right to counsel if certain things happen. For example, a failure to properly assist counsel in the case, to communicate or to reasonably help the attorney represent the parent. And so a parent's failure to cooperate with appointed counsel can certainly amount to an implicit waiver of the right to counsel.
>
> It is within the trial court's discretion whether to grant or deny a motion to withdraw. And in considering something like this, the courts have to consider the principles that are in the Tennessee Rules of Professional Conduct when trying to decide whether a parent has implicitly waived his right to appointed counsel and then whether to grant the motion to withdraw. [Looking at the reasons cited by Mr. Stiles in his motion to withdraw,] I believe that the representation of [Father by Mr. Stiles] has been made rather reasonably difficult by [Father]. . . . I believe the record is sufficient to show that [Father] has effectively waived his right to counsel. And so I'm going to . . . grant Mr. Stiles' motion and allow him to withdraw . . . .

From our review, we agree with the trial court's conclusion that Father waived his right to counsel. From the attorneys' motions to withdraw, statements made in court, and the shear number of attorneys appointed to represent Father in this case, it is clear that Father is unwilling to accept representation. During these proceedings, Father frequently filed pro se motions while represented, filed bar complaints against his appointed attorneys, was hostile with them and their staff, and constantly complained to the court that they did not follow all his orders, which he believed meant that they were not adequately representing him. Given Father's behaviors, we agree with the trial court's assessment that "[Father] [is] not going to accept any attorney's representation." Nonetheless, after allowing Mr. Stiles (Father's sixth appointed attorney) to withdraw, the trial court appointed Charlotte Mattingly as "elbow counsel" to assist Father with any questions he might have during the proceedings. As set out in its order appoint Ms. Mattingly:

> It appears to the Court from the affidavit of indigency filed in this matter that the respondent, [Father], is entitled to court-appointed counsel pursuant to Tennessee Supreme Court Rule 12,
>
> It is therefore ordered that CHARLOTTE MATTINGLY is appointed as elbow counsel for this respondent . . . . Appointed counsel shall assist respondent . . . .

Given the fact that Father waived his right to counsel, the trial court was under no obligation to appoint "elbow counsel" to assist him. Nonetheless, from the record, Ms. Mattingly succeeded in getting through the hearing on the petition to terminate Father's parental rights and secured his appeal to this Court. There is no reversible error concerning the trial court's decision concerning Father's counsel.

## V. Requests for Continuance

Concerning the grant or denial of a motion for continuance, this Court has explained:

Continuances are governed by Tennessee Code Annotated 20-7-101 (2009), which provides in pertinent part that continuances "may always be granted by the court, upon good cause shown, in any stage of the action." A ruling on a motion for continuance is a matter of discretion for the trial court and will not be disturbed absent a clear showing of abuse of that discretion. *See Tipton v. Smith*, 593 S.W.2d 298, 301 (Tenn. Ct. App. 1979). Decisions regarding the granting or denial of a continuance are fact-specific and should be viewed in the context of all existing circumstances present at the time of the party's request for continuance. *See Nagarajan v. Terry*, 151 S.W.3d 166, 172 (Tenn. Ct. App. 2003). In order to prove that a requested continuance is justified, the party requesting the continuance "must supply some 'strong excuse' for postponing the trial date." *Howell v. Ryerkerk*, 372 S.W.3d 576, 580-81 (Tenn. Ct. App. 2012) (quoting *Barber & McMurray, Inc. v. Top-Flite Dev. Corp. Inc.,* 720 S.W.2d 469, 471 (Tenn. Ct. App. 1986)). When considering a motion for continuance, the following factors are relevant to the trial court's decision: "'(1) the length of time the proceeding has been pending, (2) the reason for the continuance, (3) the diligence of the party seeking the continuance, and (4) the prejudice to the requesting party if the continuance is not granted.'" *Howell*, 372 S.W.3d at 580-81 (quoting *Nagarajan*, 151 S.W.3d at 172). Although this Court rarely interferes with a trial court's decision regarding the granting or denial of continuances, "we are constrained to do so where it is made to appear . . . that the ends of justice probably require it." *Clark v. Jarrett*, 61 Tenn. 467 (1873); see also Morrow v. Sneed, 114 S.W. 201, 201 (Tenn. 1908) ("[F]orcing [the plaintiff] to trial under the circumstances worked a hardship, and was not warranted by any equitable consideration or legal necessity."); *cf. Turtle Creek Apartments v. Polk*, 958 S.W.2d 789, 791-92 (Tenn. Ct. App 1997) (affirming denial of a continuance under a distinguishable factual situation from that in *Morrow*).

*Tidwell v. Burkes*, No. M2015-01270-COA-R3-CV, 2016 WL 3771553, at *5 (Tenn. Ct. App. July 8, 2016). As the *Tidwell* Court noted, a trial court's grant or denial of a motion for continuance is reviewed under an abuse of discretion standard. *See also Blake v. Plus Mark, Inc.*, 952 S.W.2d 413, 415 (Tenn. 1997). The Tennessee Supreme Court has explained:

Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to propriety of the decision made." *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000); *State v. Gilliland*, 22 S.W.3d 266, 273 (Tenn. 2000). A trial court abuses its discretion only

when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." ***State v. Shirley***, 6 S.W.3d 243, 247 (Tenn. 1999). The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court. ***Myint v. Allstate Ins. Co.***, 970 S.W.2d 920, 927 (Tenn. 1998).

***Eldridge v. Eldridge***, 42 S.W.3d 82, 85 (Tenn. 2001).

As set out in its order terminating Father's parental rights:

The court recognizes that Tennessee law necessitates appointment of counsel in termination of parental rights cases when a parent qualifies. During this custodial episode, the court has appointed multiple attorneys to represent [Father]. Each of those relationships failed and [Father] either asked them to withdraw or the attorney asked to be relieved citing the Rules of Professional Conduct requiring their withdrawal. At times, [Father] has chosen to represent himself. On at least the last two occasions the court has taken up motions regarding relieving [Father's] attorneys, the court has cautioned [Father] and encouraged him to work with the appointed attorney to prepare his defense, even warning him that the right to counsel can be waived by certain acts or obvious noncooperation and that the court will likely not continue to appoint attorneys to represent him. Despite his current request for another attorney to be appointed, the court finds that [Father] has consistently shown an unwillingness to be represented and therefore has effectively waived his right to counsel.

The court ultimately appointed an experienced attorney, not to represent [Father], but to serve as "elbow counsel" to advise, assist, and answer questions for him. [Father] rejected that assistance.

Father's requests for continuances primarily have been based on his assertion that he needs appointed counsel. However, as discussed above, Father's inability to cooperate in his representation has resulted in withdrawal of all attorneys appointed to the case (except Ms. Mattingly). It is disingenuous for Father to assert that his lack of counsel, which is the result of his own recalcitrance, necessitates a need for continuance. The four children at issue in this case have been in DCS custody since May of 2022. From our review, Father's actions during these proceedings already have resulted in unnecessary and significant delays in adjudicating this case. Meanwhile, the children have been kept in limbo and deprived of a permanent home. Further delay is unwarranted, and the trial court did not abuse its discretion in proceeding with the hearing on DCS's petition.

## VI. Grounds for Termination

The trial court terminated Father's parental rights on the grounds of failure to

manifest an ability and willingness to assume custody, Tenn. Code Ann. § 36-1-113(g)(14), and mental incompetence, Tenn. Code Ann. § 36-1-113(g)(8).  Although only one ground must be proven by clear and convincing evidence, the Tennessee Supreme Court has held that "appellate courts must review a trial court's findings regarding all grounds for termination and whether termination is in a child's best interests, even if a parent fails to challenge these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 511. Accordingly, we will review the trial court's findings as to both grounds.

## A. Mental Incompetence

Tennessee Code Annotated section 36-1-113(g)(8) provides that, in relevant part, that:

(B) The court may terminate the parental or guardianship rights . . . if it determines on the basis of clear and convincing evidence that:

(i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's . . . mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent . . . will be able to assume or resume the care of and responsibility for the child in the near future; and

(ii) That termination of parental or guardian rights is in the best interest of the child;

This Court has explained the purpose and requirements of this statutory ground as follows:

The statute is intended to prevent a child from remaining indefinitely in foster care when the parents will not be able to properly care for the child due to mental illness. *In re Diamond F.*, No. M2020-01637-COA-R3-PT, 2022 WL 905791, at *10 (Tenn. Ct. App. Mar. 29, 2022). The relevant inquiry is whether clear and convincing evidence establishes that "the parent of the child is incompetent to adequately provide care and supervision because the parent's mental condition is so impaired and likely to remain so that it is unlikely that the parent will be able to assume care and responsibility for the child in the future." *In re Jayda J.*, No. M2020-01309-COA-R3-PT, 2021 WL 3076770, at *6 (Tenn. Ct. App. July 21, 2021) (quoting *State Dept. of Children's Services v. Whaley*, No. E2001-00765-COA-R3-CV, 2002 WL 1116430, at *14 (Tenn. Ct. App. May 30, 2002)). A finding of mental incompetence does not require a condition that is untreatable. *In re Josie G.*, [No. E2021-01516-COA-R3-CV,] 2022 WL 4241987, at *10 [(Tenn. Ct. App. Sept. 15, 2022)]. Instead, the statute requires impairment to the extent that the parent cannot adequately provide care and supervision of the child. *Id*. DCS must show (1) that the parent is presently unable to care for the child; and (2) that the parent is unlikely to be able to care for the child in the

near future. ***In re Joseph D.***, No. M2021-01537-COA-R3-PT, 2022 WL
16848167, at *19 (Tenn. Ct. App. Nov. 10, 2022) (citing ***In re David J.B.***,
No. M2010-00236-COA-R3-PT, 2010 WL 2889265, at *7 (Tenn. Ct. App.
July 23, 2010)).

***In re B.D.M.***, No. E2022-00557-COA-R3-PT, 2023 WL 3019005, at *14 (Tenn. Ct. App.
Apr. 20, 2023).

Furthermore, this Court has noted that this statutory ground is not limited to a
condition for which "no amount of intervention can assist." ***In re S.M.R.***, No. M2008-
01221-COA-R3-PT, 2008 WL 4949236, at *6 (Tenn. Ct. App. Nov. 18, 2008). Rather, we
have

affirmed the termination of parental rights when parents have suffered from
unalleviated mental disorders such as bipolar disorder, adjustment disorder
with anxiety and depressed mood, dependent personality disorder, and
schizophrenic disorder. *See e.g.*, [***State, Dep't of Human Servs. v.***] ***Smith***,
785 S.W.2d [336] at 337-39 [(Tenn. 1990)] (affirming the termination of
parental rights of a parent diagnosed with schizophrenic disorder on the basis
of mental incompetence although the acts of the mentally disabled parent
were not willful); ***In re S.M.R.***, [No. M2008-01221-COA-R3-PT,] 2008 WL
4949236, at *6 [(Tenn. Ct. App. Nov. 18, 2008)] (affirming termination of
parental rights on the statutory ground of mental incompetence when the
parent was diagnosed with bipolar disorder and personality disorder, not
otherwise specified); ***Dep't of Children's Servs. v. M.R.N.,*** No. M2006-
01705-COA-R3-PT, 2007 WL 120038, at *10 (Tenn. Ct. App. Jan. 17, 2007)
(affirming termination of parental rights on the statutory ground of mental
incompetence based on a diagnosis of adjustment disorder with anxiety and
depressed mood as well as dependent personality disorder). The parent's
mental condition, however, must impair the parent to an extent that he or she
cannot adequately provide for the care and supervision of the child. See Tenn.
Code Ann. § 36-1-113(g)(8)(B)(i).

***In re Kenneth D.***, No. M2022-01466-COA-R3-PT, 2023 WL 4249519, at *8 (Tenn. Ct.
App. June 29, 2023).

Here, the trial court found that

Ground Five alleges mental incompetence as to [Father]. [Father] has
exhibited behaviors and made statements during this case. . . that show his
mental condition is presently so impaired that he is not able to assume the
care and responsibility for his [C]hild. It is not likely the impairments will be
removed at any near date in the future. Proof presented shows incidences
where [Father] talks to himself unreasonably and reported hearing voices. He
has not responded favorably to the serious effects his visits had on his
[C]hild. The expert testified that [Father] does not have the mental ability or

- 11 -

emotional characteristics to parent the [C]hild safely. Even today [Father] does not demonstrate any awareness or understanding concerning how his statements and behaviors are indicative of problems and legitimate concerns for the safety and well-being of the [C]hild. [Father's] statements in court about incest and his desire to have sexual relations with his daughter and ultimately marry her are indicative of his mental incompetence to provide appropriate care for this child. The totality shows clearly and convincingly that this ground should be sustained . . . .

From our review, there is clear and convincing evidence to support the trial court's findings.

As noted above, based on his schizophrenia diagnosis and failure to comply with treatment, DCS ordered a mental health assessment, which was conducted by Mr. Biller, whom the trial court qualified as an expert. Concerning his observations and diagnoses, Mr. Biller testified:

Q. And regarding [Father] . . . what were your observations?
A. I did note that he was initially very defensive, you know, just kind of saying he should not be the one here . . . . He seemed easily off put or kind of hypervigilant, you know, questioning the questions, you know. I don't know. He seemed to be very guarded or hesitant in trying to determine what best to say . . . . He did discuss difficulties with his sleep pattern which can correlate with depressive symptoms. . . . He did say that he takes a Klonopin medication to help him sleep, but later—I don't know. There was a lot of contradictory statements observed. You know, in one moment he would say that he does do this. Another moment he would say he doesn't. So he was prescribed medications, but doesn't take them. He takes medications. It was kind of back and forth.

***

Q. Okay. Did [Father] exhibit any—or report any manic symptoms that you noted within your report?
A Yes, ma'am. You know, I had initially asked him about symptoms of mania, which is kind of that euphoria or high energy. He did not endorse that in naming it but then went on to list symptoms that were congruent with this. So he's saying he doesn't have difficulties with his sleep or any euphoria, but then later stated that he would stay awake for days at a time and was doing erratic things, which can correlate with psychosis, . . . but he had been seen for these symptoms in the past. He said that he had seen a doctor about this, but he was prescribed medications, but was told he doesn't have to take the medications unless he feels like he needs them, which is odd. I had not heard that . . ., but that's not common practice . . . .

Q. And what was your diagnostic impression of [Father] based on your evaluation?

A. I endorsed schizophrenia with observed paranoid behaviors and just looking at patterns that were endorsed and defensiveness and demonstrated both direct questions. just the significant amounts of the paranoid behaviors that were in the way that he responded to and then the extreme levels of defensiveness and odd behavior in answering the self-report questionnaires. He just seemed to have a very tenuous grasp on reality and what was happening around him.

Q. In your 20-plus year career, have you had experience working with individuals who have schizophrenia?

A. Yes, ma'am.

Q. Okay. And in your experience, what you observed with [Father], is that similar to what you've observed in other patients with diagnoses of schizophrenia or other dissociative disorders?

A. Yes, ma'am.

Evidence supporting Mr. Biller's clinical observations is replete in the record.

Behaviors arising from Father's mental illness were most acutely on display during visits, where Father acted inappropriately and often in sexually suggestive ways toward the Child. At the first visit, on January 11, 2023, Father informed the Child that he was going to take her, that it "was her world," that she could act however she wanted, and that she did not have to listen to him. At the next visit, on January 17, 2023, the Child clung to the supervisor's arm, and Father said, "High High, you need to be on me like that." [2] During the same visit, Father told the Child that the game peekaboo was called that because of ghosts; he then informed the Child that she had a lot of "entities" around her. At the next visit, on February 9, 2023, Father told the Child, "I'm sending minds to you." After this, Father frequently said nothing during the visits, believing that the Child could understand him telepathically. At the next visit, on February 23, 2023, Father told the Child that if she hears voices in her head to just ignore them and that sometimes things are "put in your mind." DCS supervisors also noted times when Father appeared to be laughing and speaking to himself and to people who were not there. During several virtual and in-person visits, Father wore animal onesies. He brought matching onesies for the Child and attempted to change her despite DCS informing him that he could not do so. DCS subsequently required Father to stop wearing the onesies to prevent him from trying to change the Child.

Perhaps more troubling are the overtly sexual comments and actions Father displayed. At a visit on February 16, 2023, the Child hid under the table, so Father told her

---

[2] Father never called the Child by her name, only "High High," a nickname he gave her because he was "spiritually high."

that he would come down there and kiss her and hug her—to which she responded, "Please, no." At a visit on March 9, 2023, while the child was again hiding under the table, Father noted that he could see the Child's belly and told her to not eat so much because "it's not pretty"; he then proceeded to show her his belly.

When visits progressed to therapeutic, in-person visits, Father's behavior did not change. Despite admonition from DCS supervisors, Father often told the Child that he was going to take her away. He also frequently commented on the Child's appearance, telling her that she smelled, calling her fat, and telling her not to eat so much.[3] Father often hugged the Child, forced her to sit in his lap, and kissed her on the mouth even though the Child told him not to and the caseworkers told him that it was inappropriate. On several occasions, Father tried to accompany the Child to the bathroom and became hostile when supervisors told him that he could not. Although DCS informed Father that he could not record the visits, he snuck phones into the visits and attempted to record. For example, on one occasion, Father attempted to photograph the Child after removing her clothing for a diaper change. When DCS told him he could not photograph the Child when she was unclothed, he asserted that the Child had bruising that he wanted to record. DCS workers, who were present, testified that they observed no bruises on the Child and noted that the Father held the phone in such a way as to take a picture of the Child's entire unclothed body.

Father consistently maintained that he wanted to marry both of his daughters.[4] For example, he testified:
Q. What daughter do you want to marry?
A. I want to marry both of my daughters. Now ask me what age.
Q What age do you want to marry both of your daughters?
A. Eighteen and up. And now ask me—and now ask me is it against the law in some states. Now, the thing is I can't marry my daughter. I'll have sexual relations with my daughter 18 and up and if I was in another state, I'd have sexual relations with her. And I have shown proof to the other courts, I have shown proof to the other courts that I did file what I needed to file with the housing to move to those states where incest is legal. As I said, marriage is illegal. I'm fighting for that to be honest with you. I write the legislators for the decriminalization of incest and things of that nature.

In addition to Father's statements in court, his social media posts indicate a fixation with having an incestuous relationship with the Child. Father's public posts on Facebook

---

[3] The Child's medical appointments confirmed that the she was at a healthy weight. DCS attempted to tell Father that the Child was a normal three-year-old, not overweight, and that children grew in different ways, but he would not understand.

[4] Father's other daughter was eighteen at the time of trial. She resides with her mother, and Father has no custody.

- 14 -

include the following: (1) "I don't care what any of y'all say, I'm marrying my daughter when she's old enough"; (2) "I'm sitting here wanting to marry my daughter when she gets older and wanting someone to pass the time with until then. (adult affection). Messed up situation to be in"; (3) "Fathers if you have grown daughters, stop wanting other women, choose what's yours. Don't allow the devil to stop you. Use your heart"; and (4) "I just nutted [*i.e.*, ejaculated] to my daughter. Devils eat sh\*\*, Devils eat sh\*\*! HAHAHA, I just made that a little sing a long song HAHAHA." In another Facebook post, Father stated that a "non-documented pedophile barber [told] me he likes kids, I said [I] like kids too . . . ."

In interviewing Father, Mr. Biller also observed his sexual ideations toward the Child:

> [Father] said that [the Child] is potty trained and while he's excited about this, he feels he can teach better hygiene as he has a bathroom routine that he can share for cleanliness, must inform DCS how to teach her proper bathroom hygiene and wash and not get sick from [not] being taught right.
>
> I would note that to this clinician, it seemed to be kind of an odd statement, you know, talking about potty training and feminine hygiene, but says that children rely on parents and he's going to teach and inform why they're doing things the way they're doing like cleaning and eating and why to do things a certain way. So very directive ideations. . . .

Mr. Biller ultimately opined that Father's infatuation with the Child and his expressed desire to marry her is indicative of his schizophrenia:

> Q. Okay. If [Father] has expressed a desire to marry his daughter on more than one occasion and has these very strong feelings about marrying his daughter and having an incestuous relationship with her, would that also fall in line with symptomatology of someone with schizophrenia perhaps?
> A. Yes, it would.

In addition to the inappropriate behaviors outlined above, Father has also posted threatening tirades against the court and DCS workers. Erica Little, a DCS Team Lead, testified, in part:

> Q. Has [Father] threatened the Department's representatives?
> A. He has.
> Q Has he recently posted a threat regarding the Department's staff?
> A Yes.
> Q Okay. Ms. Little, do you recognize this document [Trial Exhibit 17]?
> A Yes.
> Q Okay. What is this?
> A. [I]t is his recent—well, a post that [Father] made where he threatened DCS.
> Q. Okay. And what does it say?
> A. It says, "DCS, eat sh\*\*. Die too. Power of prayer is going to kill you and

- 15 -

all you judges against me, too. [Naming DCS employees who were assigned to the case], and all the others that seen and didn't help. [Naming the judges assigned to the case] power of prayer definitely going to kill y'all. Eat sh** die is all I got to say while I'm laughing my way to the bank.

\*\*\*

[Ms. Little reading from another of Father's posts that was admitted as part of Trial Exhibit 17]. This one says, "Every devil going to die by me. I'mma kill them by going to my entity, of course spiritually, but the power is going to make it happen physically just by the imaginary. They call it praying. I call it talking to my heart until they die. You'll see. Of course, devils might step in and say we're doing things for you. I'm going to say f*** you, too, die by me, too. Trump is not a G. Trump is a Jesus, though, crucified by me or hung by a tree. We know, you know you killed the other Johnnie. I heard that sh**. I seen that sh** while you had a n***** locked down, ain't done sh**. Devil's had your mind gone, bitch n*****."

From the foregoing, which is just a small sampling of the evidence, there is clear and convincing proof that Father's "mental condition is presently so impaired" as to make him "incompetent to adequately provide for the [] care and supervision of the [C]hild." Tenn. Code Ann. § 36-1-113(g)(8)(B)(i). Unfortunately, there is also clear and convincing evidence that Father's mental impairment is "likely to remain so that it is unlikely that [he] . . . will be able to assume [] the care of and responsibility for the [C]hild in the near future. *Id.* In the first instance, at times, Father denied that he has schizophrenia. Ashley Berry, who was an FSW on the case, testified:

Q. Okay. Did [Father] ever discuss his mental health with you?
A. Yeah. He said that he was diagnosed with schizophrenia but it had—he wasn't diagnosed with that anymore.

Then, in his testimony, Father stated:

Q [to Father]. . . . You have been diagnosed with schizophrenia, correct?
A. Yes.

Father's contradictory statements corroborate Mr. Biller's observation that Father often demonstrated inconsistent and incongruous ideas. Perhaps Father occasional denial of his condition explains his lack of compliance in taking his medications as prescribed. Father testified:

Q [to Father]. Okay. Are you taking medication for your schizophrenia currently?
A Yes, I am.
\*\*\*
Q So are you taking that as needed?

- 16 -

A Yes.

Q Okay. So you're not taking it regularly every day?

A Well, sometimes -- well, here and there, not every day, but I do take it because I

don't have any issues. You know what I'm saying? When I have issues, then I take it.

Mr. Biller testified that to maintain mental health, a schizophrenic person would have to "be very involved in treatment" and be compliant with medications, to-wit:

Q. In your experience, what are—what are the recommendations that you would offer regarding a parent who does have a diagnosis of schizophrenia and is having psychotic symptoms similar to what you observed during your evaluation and also what had been reported to you not only by the Department, but by [Father] himself?

A. I think that it would be very daunting or difficult for this person to maintain continuity [and a] sense of personal mental health and well-being. He would have to be very involved in treatment in order to maintain his mental health and well-being. Again, that difficulty with grasping reality and constructs. It does kind of seem to cycle in and out with persons that have schizophrenia. There's a myriad of factors that can contribute to this. I know he had noted like long durations of time without sleeping. I mean, that affects the sense of mental health and well-being of all persons, but you have that tenuous grasp on reality, just something as simple as not having adequate rest or sleep can really alter that frame of mind. I feel that it would be very difficult for him to maintain his own stability, which would potentially adversely affect his ability to parent.

Q. How—how often do you see schizophrenics who are not prescribed medications to control their mental illness?

A. Very rare that a person with that type of mental health disorder is not taking or in need of medication to help regulate that.

Q. Okay. So would you say it is very important with someone or for someone with a diagnosis of schizophrenia to maintain his mental health treatment and to take medications that are prescribed?

A. I would say yes to that.

By his own testimony, Father has done none of the things that Mr. Biller explained were necessary for him to maintain his mental health. His failure to do so has resulted in further mental decline during the pendency of this case. For example, Mr. Biller testified:

Q. And it's been a year, a little over a year now since you evaluated [Father], but if his condition presently has escalated since you last saw him in September of 2023, his symptoms are increasing, is that suggestive that this condition is not likely to resolve anytime in the near future?

A Yes. I would agree with that.

Likewise, Ms. Little testified:
> Q. You've been on this case since May of 2022. Have you seen [Father's] mental condition, has it improved or worsened or stabilized?
> A. His mental health has drastically declined since I have first met [Father].
> Q. Okay. So from your perspective and your frequent interactions and conversations with him, you believe he's declined even more so now than maybe when Mr. Biller completed his evaluation back in September of 2023?
> A. Definitely.

In view of the fact that Father's condition has remained largely untreated and the fact that his troubling symptoms have only increased during the course of these proceedings, there is clear and convincing evidence that Father's mental incapacity is "so likely to remain [] that it is unlikely [he] . . . will be able to assume . . . the care of and responsibility for the [C]hild in the near future." Tenn. Code Ann. § 36-1-113(g)(8)(B)(i). Accordingly, the trial court did not err in terminating Father's parental rights on this ground.

### B. Failure to Manifest an Ability and Willingness to Assume Custody

The trial court found that Father failed to manifest an ability and willingness to assume custody or financial responsibility for the Child under Tennessee Code Annotated section 36-1-113(g)(14) and that placing the Child in his care would pose a substantial risk of harm. Tennessee Code Annotated section 36-1-113(g)(14) provides a ground for termination of parental rights when

> [a] parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14).

This ground for termination of parental rights requires the movant to establish two elements by clear and convincing evidence. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018) (citation omitted). Concerning the first element, DCS has the burden to prove that Father failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. Tenn. Code Ann. § 36-1-113(g)(14). The Tennessee Supreme Court has adopted the interpretation of section 36-1-113(g)(14) set out in *In re Amynn K.*, No. E2017-11866-COA-R3-PT, 2018 WL 3058280 (Tenn. Ct. App. June 20, 2018); *see In re Neveah M.*, No. M2019-00313-SC-R11-PT, 2020 WL 7258044, at *14 (Tenn. Dec. 10, 2020) (citing *In re Amynn K.*, 2018 WL 3058280, at *14). The interpretation adopted by our Supreme Court places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal custody or financial responsibility for the child.

- 18 -

If a parent seeking to terminate parental rights proves by clear and convincing evidence that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied. ***In re Naveah M.***, 2020 WL 7258044, at *14. If the first element is met, then DCS must show that placing the child in Father's custody poses "a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14). Concerning this ground, the trial court found that

> [Father] has failed to show any ability or willingness to personally assume [] responsibility for the child Ayzelee. The court further finds that placing her in his custody would pose a risk of substantial harm to her physical and psychological welfare. In addition to his continued drug use, [Father] has not shown any understanding or even awareness that his statements and behaviors during the limited visits with this child . . . are very concerning. At no time during this custodial episode would it have been appropriate to place this child with him and he has done little to attempt to persuade otherwise. All from which the court finds the evidence is clear and convincing that [Father] has failed to assume custody of financial responsibility for the child . . . as contemplated by the statute.

The trial court's findings are supported by the evidence. For example, Mr. Biller testified that Father has no ability to assume custody of this Child:

> Q. Okay. In your report, you said that [Father] exhibited some paranoid ideation and his grasp on reality and how he presents himself seemed to be tenuous. And then you go on to say he does not appear to have the mental ability to provide safe parenting for this [C]hild. His emotional characteristics point to severe psychopathology that would impede his ability to parent his [C]hild.
> A. That is my opinion, yes.
> Q. Okay. Do you see—based on what you observed in September of 2023, do you see any likelihood of that condition improving anytime soon that would allow him to be in a position to parent a child safely and appropriately?
> A. I think that there would need to be a lot of work that he would need to engage in to try to stabilize those areas of mental health as well as potentially some psychotherapy and medication to help with treatment of those issues.
> Q. Okay. But his mental condition is so impaired, or at least it was in September of 2023 when you evaluated him, that it was likely to remain impaired to a level that he would not be able to resume care and responsibility for a [C]hild in the near future, correct?
> A, Based on the patterns observed, I would agree with that, yes.

***

> Q Okay. And based on your observations and findings, would [Father] be

able to handle day-to-day parenting responsibilities without a support system?

A. It seems highly unlikely.

Q. Okay. Would you have concerns about his ability to listen to and put into practice the advice of professionals such as doctors, mental health workers, in-home service workers, etc.?

A. I would have a strong concern about his ability to listen to the advice of others.

Q. Okay. And it is your professional and expert opinion that this situation is unlikely to resolve itself in the foreseeable future, correct?

A That is correct.

From Mr. Biller's observations and opinions, which are supported by other evidence such as Father's Facebook posts, his outbursts during the hearings, his treatment of appointed counsel, and his sexual ideation of the Child, there is clear and convincing evidence to satisfy the first prong of this ground, *i.e.*, Father does not have the ability to assume custody.

As to the second prong of this ground, risk of substantial harm, Mr. Biller testified:

Q Okay. And [do] you [have] significant concerns about a person with such thoughts [*i.e.*, wanting to marry his child] parenting a young child, especially a daughter?

A. Very much so, yes.

Q. And would that cause you to believe that that child would be at risk of substantial harm if placed in the care of someone like [Father] with such thoughts?

A. Very much so, yes.

***

Q. . . . You're still not saying that you believe it would be appropriate to place this [C]hild with [Father] based on your concerns and findings?

A. I do not think that would be a good idea. . . . At the minimum, if you decide that you're going to do that anyway, then you should at least check up on this [C]hild because there's a high likelihood that this [C]hild would potentially be unsafe.

Ms. Little also expressed concern for the Child's safety:

Q Okay. As far as [Father] is concerned, what are the barriers to reunification from your perspective?

A. I would say his mental health would be the biggest barrier. And I would say the [C]hild's safety because I feel that if the [C]hild were to be put in [Father's] care, he would groom her and she would be a victim of sexual abuse.

***

Q Okay. Are you concerned about Ayzelee's safety?
A Yes. I'm concerned about her safety . . . .

Mr. Biller and Ms. Little's concerns are justified by the record. Father's mental health poses a real and substantial risk of danger for the Child.

Unfortunately, Father's mental health issues are only compounded by his substance abuse issues. Ms. Berry testified:

Q. So in addition to the concerns regarding Father's mental health issues, was [DCS]
not also concerned with a substance abuse?
A. We were. I had requested his criminal records from Iowa, and in one of them it showed that he had stolen alcohol. So we decided to drug screen him, which he consented to, and that is when he tested positive for methamphetamine.
Q. I'm sorry, that he what?
A. He tested positive for methamphetamine.
Q. And did you arrange for [Father] to be drug screened as part of his permanency plan requirement?
A. I did.
Q. And do you recall the date that you arranged for him to be drug screened?
A. [The following answer is corroborated by Trial Exhibit 6, which is a collection of Father's drug screens]. Yes. March 21st of 2023, he tested positive for methamphetamine and amphetamine with a hair follicle. On April 27th of 2023, he refused to do a urine drug screen. On July 20th of 2023, . . .the test was rejected for testing from Labcorp, because the sample could not be tested due to [Father] signing a different name. He signed T. Capely on the collection bag and put Xs through his name and his initials. . . . Health Connect contacted us and told us that they wouldn't be able to complete the sample. He then did a hair follicle August 24th of 2023, and it was positive for meth and amphetamine. And then he did a urine drug screen on September 25th of 2023, and it was positive for opiates.

From the record, there are myriad reasons why this Child would be in danger if placed in Father's custody. As such, DCS met its burden as to the second prong of this ground. The trial court did not err in terminating Father's parental rights on this ground.

### VII. Best Interest

Tennessee Code Annotated section 36-1-113(i)(1) contains a non-exclusive list of factors applicable to the court's best-interests analysis. The statute provides:

(i)(1) In determining whether termination of parental or guardianship rights

- 21 -

is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court.

At the time of the filing of the petition to terminate Mother's parental rights, those factors included, but were not limited to, the following:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable

manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

The statutory factors are not exclusive but "illustrative . . . and any party to the termination proceeding is free to offer any other factor relevant to the best[-]interests analysis." ***In re Gabriella D.***, 531 S.W.3d 662, 681 (Tenn. 2017) (citation omitted). Whether termination is in the child's best interest must be "'viewed from the child's, rather than the parent's,

perspective.'" *Id.* (quoting *In re Audrey S.*, 182 S.W.3d at 878). "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child[.]" *Id.* (quoting Tenn. Code Ann. § 36-1-101(d) (2017)). The court's "'focus on the perspective of the child is the common theme' evident in all of the statutory factors." *In re Neveah M.*, 614 S.W.3d 659, 679 (Tenn. 2020) (quoting *In re Audrey S.*, 182 S.W.3d at 878).

The trial court's factual findings relevant to the best-interest analysis must be supported by a preponderance of the evidence. *In re Kaliyah S.*, 455 S.W.3d at 555 (citation omitted). Additionally, the court must determine whether the combined weight of the facts amounts to clear and convincing evidence that termination of parental rights is in the child's best interest. *Id.* (citation omitted). As noted above, we review the trial court's best-interest analysis under the standard of review applicable to mixed questions of fact and law. *In re Taylor B.W.*, 397 S.W.3d at 112-113. We will affirm the trial court's factual findings unless they are unsupported by a preponderance of the evidence. *In re Neveah M.*, 614 S.W.3d at 674 (citations omitted). Whether the court's factual findings amount to clear and convincing evidence that termination of parental rights is in the child's best interest is a question of law that we review *de novo* with no presumption of correctness. *Id.* (citations omitted).

Turning to the final order, the trial court considered the relevant statutory factors and made the following findings:

1) This [C]hild has a critical need for stability and continuity of placement throughout her minority.

2) She is bonded to her siblings and to her foster home and a change of caretakers and physical environment would have a negative effect on her emotional and psychological conditions.

3) [Father] has not shown continuity and stability in being able to meet the [C]hild's basic needs.

4) The [C]hild does not have a parental attachment to [Father] and there is no expectation that [Father] could create such an attachment.

5) [Father] has not visited with the [C]hild regularly despite having opportunity to do so and when he did, he did not cultivate a positive relationship with the [C]hild but rather scared the [C]hild and the adults supervising the visit.

6) The [C]hild exhibited fear of [Father] during the limited contact they had during this case.

7) This [C]hild has a healthy parental attachment to the foster parents.

8) The [C]hild is bonded to her siblings and others within the foster home.

9) There is no evidence [that] termination of [Father's] parental rights would have any negative impacts on the [C]hild related to any relationships biological or otherwise.

10) [Father] has not demonstrated an adjustment of circumstances, conduct,

- 24 -

or conditions that would make it safe and beneficial for this [C]hild to be in his home as outlined above and which renders him unable to consistently care for the [C]hild in a safe and stable manner.

11) [Father] has not taken advantage of available services and resources to assist him in making a lasting adjustment of his circumstances, conduct, or conditions despite them being available and DCS making reasonable efforts to assist him both locally and in Iowa.

12) This [C]hild has been in custody for well over two years but [Father] has not shown any sense of urgency in appropriately seeking custody of the [C]hild.

13) [Father] has not ever cared for this [C]hild and has not been in a position to abuse the [C]hild but has stated a belief that sexual contact with the [C]hild should be allowed.

14) [Father] has never been in a position to provide safe care for the [C]hild nor has he been committed to creating and maintaining a home that meets the [C]hild's needs where she can thrive.

15) [Father] has not consistently provided financial support for the [C]hild.

16) [Father's] mental and emotional fitness would be detrimental to the [C]hild and prevents him from consistently and effectively providing safe and stable care for the [C]hild.

All from which the court finds that termination of [Father's] parental rights is in Ayzelee's best interests.

For many of the reasons previously discussed, termination of Father's parental rights is in the Child's best interest. The primary barrier to custody in this case is Father's mental incompetence. As discussed in detail above, Father's largely untreated schizophrenia results in a lack of "mental or emotional fitness" that would allow Father to provide a safe and stable home for the Child. Tenn. Code Ann. § 36-1-113(i)(1)(T). Father's denial of his condition and his refusal to consistently take his prescribed medication shows a lack of "ability and commitment to creating and maintaining a home that meets the child's basic and specific needs. . . ." Tenn. Code Ann. § 36-1-113(i)(1)(Q). Father's home would not be "healthy and safe for the [C]hild." Tenn. Code Ann. § 36-1-113(i)(1)(R). Furthermore, although this custodial episode has been pending since May 2022, Father has "not demonstrated a sense of urgency [in] addressing the circumstance, conduct, or conditions that ma[k]e an award of custody unsafe and not in the [C]hild's best interest." Tenn. Code Ann. § 36-1-113(i)(1)(M). Father has not addressed his mental health issues and has continued to demonstrate inappropriate behaviors. As such, Father has not demonstrated "continuity and stability in meeting the [C]hild's basic . . . safety needs." Tenn. Code Ann. § 36-1-113(i)(1)(M). Father's mental incompetence is exacerbated by his untreated substance-abuse issues. As such, "the use of . . . controlled substances . . . [would] render [Father] unable to consistently care for the [C]hild in a safe and stable manner." Tenn. Code Ann. § 36-1-113(i)(1)(J). Unless and until Father's mental health and substance-

abuse issues are treated, he cannot provide a safe and stable home for this Child. His behaviors would only place the Child in danger.

Although Father has availed himself of visits, as discussed above, these visits largely have been detrimental to the Child. During visits, the Child hides under tables and refuses to approach Father. Tenn. Code Ann. § 36-1-113(i)(1)(F) ("[T]he child is fearful of living in the parent's home"). As discussed above, Father acted inappropriately during visits and often demonstrated incestuous and pedophilic proclivities. As such, under Tennessee Code Annotated section 36-1-113(i)(1)(N), Father "has shown . . . sexual, emotional, or psychological abuse . . . toward the [C]hild." By his own admission, Father wants to marry and have sexual relations with this Child. In no way has Father "shown an ability to cultivate a positive relationship with the [C]hild," Tenn. Code Ann. § 36-1-113(i)(1)(E), and he has failed to "demonstrate[] an understanding of the basic and specific needs required for the [C]hild to thrive." Tenn. Code Ann. § 36-1-113(i)(1)(P). As such, there is no bond between Father and Child, and there is little likelihood that any parental bond will form. As such, Tennessee Code Annotated section 36-1-113(i)(1)(D), *i.e.* "[w]hether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment," weighs in favor of termination of Father's parental rights.

Since her removal to DCS custody, Azyelee has resided in the same foster home with her half-siblings. DCS caseworkers and the foster mother testified that the Child is bonded with her half-siblings and with her foster family. Tenn. Code Ann. § 36-1-113(i)(1)(H) ("[T]he child has created a healthy parental attachment with another person or persons in the absence of the parent."); Tenn. Code Ann. § 36-1-113(i)(1)(I) ("[T]he child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings"). Accordingly, removing the Child from her current placement would negatively affect her "critical need for stability and continuity of placement." Tenn. Code Ann.§ 36-1-113(i)(1)(A). From the evidence, such change would be detrimental to the Child's "emotional [and] psychological. . . condition." Tenn. Code Ann. § 36-1-113(i)(1)(B).

For these reasons and many others discussed above, the trial court's findings on the statutory, best-interest factors are supported by a preponderance of the evidence and the weight of those findings constitutes clear and convincing evidence that termination of Father's rights is in the Child's best interest.

## VIII. Conclusion

For the foregoing reasons, we affirm the trial court's order terminating Appellant's parental rights. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to the Appellant, Johnnie C. Because Johnnie C. is proceeding *in forma pauperis* in this appeal, execution

for costs may issue if necessary.

                                    s/ Kenny Armstrong
                                    KENNY ARMSTRONG, JUDGE